# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Angela Craig and Jenny Winslow Davies,

Case No. 20-cv-2066 (WMW/TNL)

Plaintiffs,

**ORDER GRANTING MOTION TO INTERVENE AND GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

v.

Steve Simon, *in his official capacity as Minnesota Secretary of State*,

Defendant,

and

Tyler Kistner,

Movant/Intervenor Defendant.

---

This lawsuit, commenced after the death of the Legal Marijuana Now Party's (LMNP) candidate for Minnesota's Second Congressional District, involves a challenge to a Minnesota law that requires postponing the election date for a specific seat if a major political party candidate for that seat dies within 79 days before the general election. Minn. Stat. § 204B.13. Before the Court is Movant Tyler Kistner's motion to intervene and Plaintiffs' motion for a preliminary injunction. (Dkts. 14, 24). For the reasons addressed below, Kistner's motion to intervene is granted and Plaintiffs' motion for preliminary injunction is granted.

## BACKGROUND

Plaintiff Angela Craig is the current United States Representative for Minnesota's Second Congressional District and is running for re-election. Plaintiff Jenny Winslow

Davies is a voter in Minnesota's Second Congressional District who has already cast her ballot for the upcoming November 2020 general election.  Early voting in Minnesota began on September 18, 2020.

On September 21, 2020, the LMNP candidate for Minnesota's Second Congressional District, Adam Weeks, unexpectedly died.  Under Minnesota Statutes Section 204B.13 (Minnesota Nominee Vacancy Statute), if a "major political party" candidate[1] nominated to run in an upcoming election dies after the 79th day before the general election, the election date for that race is postponed and votes cast in the general election for that office must not be certified.  Minn. Stat. § 204B.13, subdiv. 2(c).  The Minnesota Nominee Vacancy Statute further provides that the Governor of Minnesota must issue a writ calling for a special election, conducted on the second Tuesday in February of the year following the year the vacancy in nomination occurred, to fill the seat for which the nominee vacancy occurred.  Minn. Stat. § 204B.13, subdiv. 7.

On September 24, 2020, in response to Weeks's death, Defendant Steve Simon, the Minnesota Secretary of State, issued a public statement that "[e]ligible voters in the Second Congressional district should continue to vote" and that, although the Second Congressional District race would still appear on the ballot, under Minnesota law "the votes in that race will not be counted."

---

[1]     It is undisputed that the LMNP is a "major political party," as defined under Minnesota Statutes Section 200.02, subdiv. 7.

On September 28, 2020, Plaintiffs commenced this lawsuit challenging the Minnesota Nominee Vacancy Statute as preempted by federal law and unconstitutional. Plaintiffs filed the pending motion for a preliminary injunction on September 29, 2020, seeking a court order for declaratory and injunctive relief.  Specifically, Plaintiffs seek an order enjoining the Minnesota Secretary of State from (1) enforcing the Minnesota Nominee Vacancy Statute, (2) refusing to give legal effect to ballots cast in the general election for Minnesota's Second Congressional District, and (3) communicating to Minnesota voters that their ballots cast in the general election for Minnesota's Second Congressional District will not be counted.

On September 30, 2020, Movant Tyler Kistner, the Republican Party of Minnesota's candidate for Congress in Minnesota's Second Congressional District, moved to intervene in this case as a party defendant.

## ANALYSIS

### I.     Motion to Intervene

The Court must first address Kistner's motion to intervene as a party defendant so as to determine whether his arguments in opposition to Plaintiffs' motion for a preliminary injunction may be considered.  Federal Rule of Civil Procedure 24 governs motions to intervene and provides two avenues for intervention—intervention of right under Fed. R. Civ. P. 24(a) and permissive intervention under Fed. R. Civ. P. 24(b).  Kistner seeks to intervene as of right and seeks permissive intervention in the alternative.  Fed. R. Civ. P. 24(a), (b).  Although no party opposes Kistner's motion to intervene, the Court evaluates Kistner's motion under the applicable legal standards.

3

A.       Standing

As a threshold matter, the United States Court of Appeals for the Eighth Circuit has held that "Article III standing is a prerequisite for intervention in a federal lawsuit." *Curry v. Regents of Univ. of Minn.*, 167 F.3d 420, 422 (8th Cir. 1999) (internal quotation marks omitted); *see also Mausolf v. Babbitt*, 85 F.3d 1295, 1299–1300 (8th Cir. 1996).   Article III of the United States Constitution limits federal jurisdiction to actual cases or controversies.   U.S. Const., art. III, § 2, cl. 1; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *Hargis v. Access Capital Funding, LLC*, 674 F.3d 783, 790 (8th Cir. 2012). The standing inquiry requires the litigant to (1) have suffered an injury in fact, (2) establish a causal connection between the injury and the challenged action, and (3) show that the injury would be redressed by a favorable decision.   *See Lujan*, 504 U.S. at 560–61; *City of Clarkson Valley v. Mineta*, 495 F.3d 567, 569 (8th Cir. 2007).

1.       Injury in Fact

An alleged injury must be "concrete, particularized, and either actual or imminent." *United States v. Metro. St. Louis Sewer Dist.*, 569 F.3d 829, 834 (8th Cir. 2009) (internal quotation marks omitted).   "The law recognizes economic, non-economic, and indirect economic injuries, for standing purposes." *Animal Prot. Inst. v. Merriam*, 242 F.R.D. 524, 527 (D. Minn. 2006).   A prospective intervening defendant may establish an imminent injury sufficient for the purpose of standing by demonstrating that the remedies sought by the plaintiff, if granted, would threaten the prospective intervenor's interests.   *See South Dakota v. Ubbelohde*, 330 F.3d 1014, 1025 (8th Cir. 2003) (concluding that "[s]uccess by

4

[the plaintiff] in the whole litigation would impair the proposed intervenors' interests," and reversing the district court's denials of the motions to intervene).

Kistner argues that he has an interest in ensuring that the Minnesota Nominee Vacancy Statute is enforced, as it would impact his candidacy and campaign for Minnesota's Second Congressional District.  Plaintiffs seek to have the Minnesota Nominee Vacancy Statute enjoined and declared preempted by federal law and unconstitutional.  Such an injunction and declaration would threaten Kistner's alleged interests.  *See id.*  Moreover, as alleged, this injury is concrete, particularized, and imminent, because it personally impacts Kistner's interests with respect to the impending election.  Therefore, Kistner has established an injury in fact.

### 2.    Causation

A proposed intervenor satisfies the traceability requirement if the defendant would be compelled to cause the alleged injury to the intervenor if the plaintiff prevails.  *Am. Civil Liberties Union of Minn. v. Tarek ibn Ziyad Acad.*, 643 F.3d 1088, 1093 (8th Cir. 2011). Here, if the Court were to conclude that the Minnesota Nominee Vacancy Statute is either preempted by federal law or unconstitutional, Minnesota's Secretary of State would be compelled to refrain from enforcing the statute, and Kistner would suffer the injuries he alleges.  Therefore, Kistner satisfies the causation requirement of standing.

### 3.    Redressability

An alleged injury that includes the enforcement of certain policies may be redressable by a judicial determination that the challenged policies are permitted.  *Id.*  If this Court determines that the Minnesota Nominee Vacancy Statute is enforceable, then

Kistner would not suffer the injuries he alleges.    Therefore, Kistner satisfies the redressability element of standing.

Because Kistner has demonstrated an injury in fact, causation, and redressability, Kistner has met his burden of demonstrating that he has Article III standing.  *See Lujan*, 504 U.S. at 560–61; *accord Mineta*, 495 F.3d at 569.

## B.    Intervention as of Right

The merits of Kistner's motion to intervene under Federal Rule of Civil Procedure 24 may be considered because Kistner, as a proposed intervenor, has demonstrated he has Article III standing.  *See Curry*, 167 F.3d at 422.  A court must permit intervention as of right to a proposed intervenor who: "(1) files a timely motion to intervene; (2) claims an interest relating to the property or transaction that is the subject of the action; (3) is situated so that disposing of the action may, as a practical matter, impair or impede the movant's ability to protect that interest; and (4) is not adequately represented by the existing parties." *Nat'l Parks Conservation Ass'n v. U. S. Env't Prot. Agency*, 759 F.3d 969, 975 (8th Cir. 2014) (internal quotation marks omitted).

When assessing whether a motion to intervene is timely, a district court considers "(1) the extent the litigation has progressed at the time of the motion to intervene; (2) the prospective intervenor's knowledge of the litigation; (3) the reason for the delay in seeking intervention; and (4) whether the delay in seeking intervention may prejudice the existing parties." *Tarek ibn Ziyad Acad.*, 643 F.3d at 1094.  Here, Kistner filed his motion to intervene two days after Plaintiffs filed the complaint.  The litigation was at an early stage when Kistner moved to intervene.  Moreover, the approximately 48 hours that elapsed

between the filing of the complaint and Kistner's motion to intervene do not constitute a delay.  Therefore, Kistner's intervention is, unquestionably, timely.

Kistner claims an interest relating to the subject matter of this litigation as he is a candidate for Minnesota's Second Congressional District.  The pending motion for a preliminary injunction asks this Court to determine whether the Minnesota Nominee Vacancy Statute is preempted by federal law or is unconstitutional.  As a nominee in the election for Minnesota's Second Congressional District, Kistner has an interest in the subject matter and the outcome of this litigation.

The Court's decision in this matter could impair or impede Kistner's ability to protect the interest that he claims in the enforcement of the Minnesota Nominee Vacancy Statute.  The Minnesota Nominee Vacancy Statute dictates that votes will not be certified in the November general election for Minnesota's Second Congressional District.  Minn. Stat. § 204B.13, subdiv. 2(c).  Given the short period of time between the commencement of this case and the November general election, resolution of these questions presented must be expedited because these questions will be moot in less than one month.  Kistner has a limited window of time in which to protect the interest he claims in the enforcement of the Minnesota Nominee Vacancy Statute and his ability to protect the interest he claims would be practically impaired if he is not permitted to intervene.

Finally, as a candidate for Minnesota's Second Congressional District, Kistner holds interests in this litigation that may be separate and distinct from the interests of Minnesota's Secretary of State.  As such, without Kistner's intervention, his interests are not adequately represented by the existing defendant.

7

In summary, because Kistner's intervention as a party defendant in this matter is proper as an intervention of right under Rule 24(a)(2), Fed. R. Civ. P., Kistner's motion to intervene as a party defendant is granted.[2]

## II.    Motion for Preliminary Injunction

A district court considers four factors to determine whether preliminary injunctive relief is warranted: (1) the movant's likelihood of success on the merits, (2) the threat of irreparable harm to the movant, (3) the state of balance between the harm to the movant and the injury that granting an injunction will inflict on other parties to the litigation and (4) the public interest.  *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).  The purpose of a preliminary injunction is to maintain the status quo.  *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994).  The burden rests with the moving party to establish that injunctive relief should be granted.  *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).  And this Court is mindful that preliminary injunctive relief is an extraordinary remedy that is never awarded as of right.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

## A.    Likelihood of Success on the Merits

The first *Dataphase* factor is the movant's likelihood of success on the merits. *Dataphase*, 640 F.2d at 114.   A party seeking a preliminary injunction need not demonstrate actual success on the merits, but that party must demonstrate a likelihood of success.  *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987).  In

---

[2]    In light of Kistner's status as a party defendant, subsequent references to "Defendants" in this Order include the Minnesota Secretary of State and Kistner.

opposing Plaintiffs' motion for preliminary injunction, Defendants argue that Plaintiffs are unlikely to succeed on the merits as to either their preemption claim (Count 1) or their constitutional claim (Count 2).

### 1.    Preemption

In Count 1 of the complaint, Plaintiffs allege that the Minnesota Nominee Vacancy Statute is preempted by federal law, which requires elections for members of the United States House of Representatives to be held on the Tuesday after the first Monday in November in every even-numbered year.  2 U.S.C. § 7.  Defendants counter that Minnesota Statutes Section 204B.13 is consistent with, and does not conflict with, federal law.

"A fundamental principle of the Constitution is that Congress has the power to preempt state law."  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).  As relevant here, "state law is naturally preempted to the extent of any conflict with a federal statute."  *Id.*  As such, a state law is preempted if "it is impossible for a private party to comply with both state and federal law" or if the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Id.* at 372–73 (internal quotation marks omitted).  For example, regulations pertaining to federal elections that are "made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative."  *Foster v. Love*, 522 U.S. 67, 69 (1997) (internal quotation marks omitted).

Article I of the United States Constitution provides: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such

Regulations, except as to the Places of [choosing] Senators."  U.S. Const. art. I, § 4, cl. 1 (the Elections Clause).  "[I]t is well settled that the Elections Clause grants Congress the power to override state regulations by establishing uniform rules for federal elections, binding on the States."  *Foster*, 522 U.S. at 69.  As such, although the legislature of each state may prescribe the time, place, and manner of holding elections for the United States House of Representatives, the United States Congress is authorized to alter those state laws through federal legislation.  The United States Congress has done precisely that in 2 U.S.C. § 7, which unequivocally provides:

> The Tuesday next after the 1st Monday in November, in every even numbered year, is established as the day for the election, in each of the States and Territories of the United States, of Representatives and Delegates to the Congress commencing on the 3d day of January next thereafter.

This year, the Tuesday after the first Monday in November is November 3, 2020.  Therefore, federal law requires the general election this year to occur on November 3, 2020.

The United States Congress also has provided limited exceptions to the foregoing requirement for general elections, however.  These exceptions grant state governments the authority to regulate federal elections in certain prescribed circumstances.  As relevant here, elections *to fill a vacancy* may be held at a time other than the date of the general election:

> [T]he time for holding elections in any State, District, or Territory for a Representative or Delegate *to fill a vacancy*, whether such vacancy is caused by a failure to elect at the time prescribed by law, or by the death, resignation, or incapacity of a person elected, may be prescribed by the laws of the several States and Territories respectively.

2 U.S.C. § 8(a) (emphasis added) (Federal Vacancies Statute).

Under the Minnesota Nominee Vacancy Statute, if a major political party candidate nominated to run in an upcoming election dies after the 79th day before the general election, the county and state canvassing boards are prohibited from certifying the vote totals from the general election for that office. Minn. Stat. § 204B.13, subdiv. 2(c). The office instead must be filled at a special election. *Id.* By statute, the special election is to be held on the second Tuesday in February of the year following the year the vacancy in nomination occurred. Minn. Stat. § 204B.13 subdiv. 7. As such, the Minnesota Nominee Vacancy Statute is inconsistent with the congressionally mandated general election date established in Title 2, United States Code, Section 7. Defendants do not appear to dispute that this conflict exists.

Instead, Defendants argue that the Minnesota Nominee Vacancy Statute is not preempted by federal law because the exception in the Federal Vacancies Statute grants the State of Minnesota authority to legislate the timing of a special election to fill a vacancy. The Federal Vacancies Statute describes a "vacancy" as one that is "caused by a failure to elect at the time prescribed by law, or by the death, resignation, or incapacity of a person elected." 2 U.S.C. § 8(a). Absent the existence of such a "vacancy," Congress has not granted state governments the authority to establish when to hold an election for the United States House of Representatives.

Defendants' argument relies on the presumption that a "vacancy in a nomination," as addressed in the Minnesota Nominee Vacancy Statute, is a "vacancy" for purposes of the Federal Vacancies Statute. But when considering the text of the Federal Vacancies Statute as a whole, the term "vacancy" is used exclusively to describe a representative's

"seat," the "person elected," or the state's "representation" in the United States House of Representatives.  2 U.S.C. § 8; *see also United States v. Morton*, 467 U.S. 822, 828 (1984) ("We do not, however, construe statutory phrases in isolation; we read statutes as a whole.").  Here, there is neither a vacant "seat" nor a vacancy of "representation" because Minnesota's Second Congressional District currently is represented in the United States House of Representatives by Representative Craig.  Therefore, the Federal Vacancies Statute, 2 U.S.C. § 8, does not save Minnesota Statutes Section 204B.13 from being preempted by federal law because the Federal Vacancies Statute does not apply to the present circumstance in which there is no "vacancy," as that term is used in the statute.

Defendants argue that "exigent circumstances" prevent holding the election for Minnesota's Second Congressional District during the November general election because the death of Weeks will result in a failure to elect a representative.  In support of this argument, Defendants rely on *Busbee v. Smith*, 549 F. Supp. 494, 525 (D.D.C. 1982), *aff'd*, 459 U.S. 1166 (1983).  But *Busbee* is inapposite.  In *Busbee*, the United States District Court for the District of Columbia held that the State of Georgia's congressional election could be scheduled for a date other than the first Tuesday after the first Monday in November in order to remedy the racially discriminatory effects of the State of Georgia's electoral procedure that had been held unlawful under the Voting Rights Act of 1965. *Busbee*, 549 F. Supp. at 519–20.  In *Busbee*, had the State of Georgia proceeded with the congressional election on the November general election date, any result of the general election would have been *necessarily invalid* because the method for choosing the candidates on the ballot for that November general election violated federal law.  *Busbee*,

549 F. Supp. at 523 ("In cases like this one, however, where it is no longer feasible, due to either the passage of time or an independent constitutional requirement, to use the old [voting] procedures, section 5 of the Voting Rights Act might well prohibit the state from holding its congressional elections on the date specified by 2 U.S.C. § 7.").  Consequently, *Busbee* involved a vacancy caused by an anticipated and inevitable "failure to elect" a representative—a circumstance in which the Federal Vacancies Statute expressly applies. *Id.* at 524–25 (quoting 2 U.S.C. § 8).[3]  Here, the parties do not argue, and the record does not suggest, that if the election for Minnesota's Second Congressional District occurs on November 3, 2020, as mandated by the United States Congress, the results of the general election would necessarily be invalid *as a violation of federal or constitutional law*.  *Busbee*, therefore, does not govern this case because the winner of the November general election for Minnesota's Second Congressional District will not have been selected in a manner that necessarily violates federal law such that there is a "failure to elect" a representative.[4]

Relying on *Public Citizen, Inc. v. Miller*, 813 F. Supp. 821 (N.D. Ga. 1993), *aff'd*, 992 F.2d 1548 (11th Cir. 1993), Defendants also argue that an exigent circumstance permits a state to hold an election on a date other than the general election date.  But in *Public Citizen*, the State of Georgia actually held a general election on the congressionally

---

[3]     The *Busbee* court also acknowledged that the Federal Vacancies Statute "creates an exception to [2 U.S.C. § 7]'s absolute rule in a *limited class of cases*."  *Id.* at 526 (emphasis added).

[4]     If Weeks were to posthumously win the November 3, 2020 general election, it is possible that a "failure to elect" will have occurred.  But unlike the circumstances in *Busbee*, that outcome is not inevitable in this case.

mandated date in November, pursuant to Title 2, United States Code, Section 7. The general election resulted in a plurality, such that a "failure to elect" actually resulted. *Public Citizen*, 813 F. Supp. at 830. And it was this failure to elect that triggered the special-election exception under the Federal Vacancies Provision resulting in a runoff election held by the State of Georgia after the November general election. Here, the State of Minnesota cannot *invent* a failure to elect or *create* an exigent circumstance by refusing to certify the vote totals for Minnesota's Second Congressional District.[5] *See id.* ("A carefully crafted law that, by its sole design, invents a 'failure to elect' cannot be thought to create an 'exigent' circumstance. This would unreasonably contort the word's definition, and allow any state to premeditate a complete avoidance of section 7's dictates . . . ."). Defendants characterize the failure to elect as arising from Weeks's death. But the death of a candidate, without more, does not inevitably result in a failure to elect a representative.[6]

---

[5]     To be clear, the Court is not suggesting that the Minnesota Nominee Vacancy Statute was drafted or enacted in bad faith. Rather, the parties' briefing and arguments indicate that the Minnesota Nominee Vacancy Statute was drafted in response to the untimely death of Senator Paul Wellstone, who tragically died in a plane crash approximately two weeks before the November general election in 2002. Notably, however, unlike in this case, the death of Senator Wellstone caused a "vacancy" as defined by the Federal Vacancies Statute because an *elected person*, as opposed to an unelected *nominee*, had died.

[6]     Under Minnesota law, the duly elected candidate, who is entitled to receive a certificate of election for a United States House of Representatives office, is the candidate who receives the highest number of votes legally cast at the election. *See* Minn. Stat. §§ 204C.33, subdiv. 1; 204C.40, subdiv. 1; 209.12. The death of Weeks, without more, does not prevent this from occurring on November 3, 2020, with respect to the general election for Minnesota's Second Congressional District. Rather, the Minnesota Nominee Vacancy Statute is the direct cause of the "failure to elect" that, according to Defendants, inevitably will occur. But, as the district court reasoned in *Public Citizen*, a state cannot pass a law that "invents a 'failure to elect' . . . to create an 'exigent' circumstance" so as to

Rather, any anticipated failure to elect a representative for Minnesota's Second Congressional District on November 3, 2020, would be a direct consequence of the Minnesota Nominee Vacancy Statute. For these reasons, the analysis in *Public Citizen* also does not apply in this case.

Therefore, Plaintiffs have demonstrated a likelihood of success on the merits as to their claim that federal law preempts the Minnesota Nominee Vacancy Statute.

### 2.    Unconstitutional Burden on Plaintiffs' Rights

Plaintiffs also allege, in Count 2 of the complaint, that the public statements of the Minnesota Secretary of State—specifically those asserting that votes cast for candidates for Minnesota's Second Congressional District in the November 3, 2020 general election will not be counted—unconstitutionally burden the rights of voters who have, or otherwise would, cast their ballots in the general election. Because the Court concludes that Plaintiffs have demonstrated a likelihood of success on the merits of their claim that the Minnesota Nominee Vacancy Statute is preempted by federal law, the Court need not address alternative reasons that this statute may be unenforceable. *See O'Brien v. U.S. Dep't of Health & Human Servs.*, 766 F.3d 862, 863 (8th Cir. 2014) (observing that "the doctrine of constitutional avoidance particularly counsels us not to give unnecessary answers to constitutional questions" (citing *Ashwander v. TVA*, 297 U.S. 288, 345–48 (1936))).

---

alter the federally mandated date on which a general election must be held. 813 F. Supp. at 830. That is the circumstance presented here.

**B.      Threat of Irreparable Harm**

The second *Dataphase* factor the Court considers is whether Plaintiffs will suffer irreparable harm absent a preliminary injunction. *Dataphase*, 640 F.2d at 114. "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). To establish the need for injunctive relief because of irreparable harm, the movant "must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013) (internal quotation marks omitted); *see also Chlorine Inst., Inc. v. Soo Line R.R.*, 792 F.3d 903, 915 (8th Cir. 2015). A mere "possibility of harm" is insufficient. *Roudachevski v. All-American Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

In the absence of a preliminary injunction, Plaintiffs argue, Representative Craig will suffer irreparable harm. First, Plaintiffs argue that Representative Craig will suffer irreparable harm because some voters who would otherwise cast their ballots for Representative Craig in November 2020 will not vote. As a consequence, Representative Craig might lose their votes, Plaintiffs contend. Also, if the Minnesota Nominee Vacancy Statute is enforced, Representative Craig will need to limit campaign efforts weeks before

the November general election and subsequently campaign for three additional months. Davies also will suffer irreparable harm, Plaintiffs argue, because the vote she cast in the November 3, 2020 general election for Minnesota's Second Congressional District will not count. And without a preliminary injunction she will be forced to vote twice, and will be unrepresented in the United States House of Representative for more than a month.

While Kistner argues Plaintiffs will not suffer irreparable harm, the Secretary of State concedes that Plaintiffs will suffer irreparable harm.

Representative Craig will suffer irreparable harm absent this Court issuing a preliminary injunction. According to Plaintiffs, Representative Craig will be forced to conserve campaign resources in anticipation of a potential special election in February, which will require candidates to campaign—and expend campaign resources—for several additional months. Although Kistner does not share Representative Craig's concerns about campaigning for three additional months, it is undisputed that campaigning is an expensive, time-consuming and resource-intensive endeavor. And these burdens are enhanced by the ongoing COVID-19 pandemic. This is a substantial burden at least on Representative Craig, if not all of the candidates, that cannot be remedied by an award of damages in the future.

Absent a preliminary injunction, Davies will also suffer irreparable harm by not having her vote count such that she is required to vote twice, and by the absence of uninterrupted congressional representation in the United States House of Representatives. Courts routinely recognize that restrictions on voting rights constitute irreparable injury. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)

(collecting cases).  Indeed, "included within the right to [vote], secured by the Constitution, is the right of qualified voters within a state to cast their ballots *and have them counted*." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964) (emphasis added) (internal quotation marks omitted).  Here, the Minnesota Nominee Vacancy Statute does more than restrict voting rights.  The statute also decrees that votes for the election in question—including votes that have already been cast—will not be counted at all.  Exclusion of these votes from consideration in the election undoubtedly restricts or violates the voting rights of those qualified voters who cast them.  Therefore, the injuries to Davies arising from the Minnesota Nominee Vacancy Statute are irreparable.

Plaintiffs, therefore, have demonstrated that they will suffer irreparable harm if a preliminary injunction is not granted.

### C.    Balance of Harms

The third *Dataphase* factor the Court considers is the balance of harms to the parties. *Dataphase*, 640 F.2d at 114.  This factor also supports an entry of a preliminary injunction. Here in the United States, the right to vote *and to have one's vote count* is a fundamental right.  *See Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 667 (1966) (discussing the "franchise of voting" as a "fundamental political right") (internal quotation marks omitted); *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 234 (6th Cir. 2011) (concluding that the "right to vote includes the right to have one's vote counted on equal terms with others") (internal quotation marks omitted); *Akizaki v. Fong*, 461 P.2d 221, 223 (Haw. 1969) ("Implicit in [the right to vote] is the right to have one's vote count . . . .").  If the Minnesota Nominee Vacancy Statute is enforced, Davies who has already cast her ballot in

Minnesota's Second Congressional District race will not have her vote count for that race. Instead she will be forced to vote twice. Defendants discredit the burden of voting twice. But the burden of voting twice is significant. And the practical reality of voting during a global pandemic compounds the burden for voters who wish to vote in person and must leave their homes in the winter to vote in a crowded polling location. In addition, Davies—like all residents of Minnesota's Second Congressional District—will be unrepresented in the United States House of Representatives for more than a month if a preliminary injunction is not granted. Moreover, Representative Craig will suffer significant harm because she will have expended resources and structured her campaign in accordance with the expectation that her campaign would conclude in November 2020.

Defendants argue that if this Court grants a preliminary injunction, everyone who votes for Weeks will not have their votes count. But if this Court does *not* issue a preliminary injunction, *not a single vote* cast in the November general election for Minnesota's Second Congressional District will count. By granting the preliminary injunction, this Court ensures that all properly cast votes in the November general election, including the votes cast for Weeks, will be counted. Therefore, the balance of harms weighs strongly in favor of granting a preliminary injunction.

The Court is mindful that there are competing potential harms to the parties. Minnesota's Secretary of State concedes that Plaintiffs will suffer irreparable harm, but argues that there also would be irreparable harm to the State of Minnesota, to the LMNP party, and to the voters in Minnesota's Second Congressional District if this Court grants Plaintiffs the relief Plaintiffs seek. If Plaintiffs receive the requested relief, Minnesota's

Secretary of State (1) would be enjoined from enforcing the Minnesota Nominee Vacancy Statute, (2) would have to remove any notices posted about the Minnesota Nominee Vacancy Statute, and (3) would have to correct statements suggesting that votes cast in the November general election for Minnesota's Second Congressional District will not count. Indeed, conflicting announcements from Minnesota's Secretary of State as to the status of votes cast in the November general election might cause some confusion. But it is also likely that the September 24, 2020 announcement generated confusion for some voters because general elections are the norm and special elections are not. And Minnesota's Secretary of State issued an announcement on September 24, 2020, that ballots will not be counted in the November general election for Minnesota's Second Congressional District, and Minnesota's Secretary of State must now clarify that all otherwise proper votes *will count* for every single race on the ticket, specifically including the race for Minnesota's Second Congressional District. But these countervailing potential harms do not tip the balance in favor of the Defendants. The balance of harms supports the entry of a preliminary injunction.

### D.     Public Interest

Finally, the fourth *Dataphase* factor this Court considers when determining whether to issue a preliminary injunction is the public interest. *Dataphase*, 640 F.2d at 114. "[I]t is always in the public interest to protect constitutional rights." *Rodgers v. Bryant*, 942 F.3d 451, 458 (8th Cir. 2019). Voters have an unparalleled interest in the fair, impartial administration of elections, free from improper restraints or constrictions on the cherished right to vote. *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)

(citing *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)).  This right to vote is "of the most fundamental significance under our constitutional structure."  *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979).  It logically follows that voters have a substantial interest in congressional representation that arises from their substantial interest in the right to vote.  If a preliminary injunction is not granted, two public-interest consequences will undisputedly occur.  First, all votes cast for Minnesota's Second Congressional District in November will be discarded.  Second, every constituent in Minnesota's Second Congressional District will have no representation in the United States House of Representatives for more than a month.  Given the overwhelming importance for Minnesota's Second Congressional District voters to be able to vote in the November general election and to have uninterrupted representation in the United States Congress, the public interest weighs in favor of granting Plaintiffs' motion for a preliminary injunction.[7]

---

[7]    Defendants argue other public interests are involved.  For example, because Weeks's name remains on the ballot, if he were to win this election posthumously, he would not be able to represent those who cast their vote for him.  The Minnesota Nominee Vacancy Statute is one way of increasing voter choice in the event of a candidate's death.  *See Monaghen v. Simon*, 888 N.W.2d 324, 331 (Minn. 2016) (explaining that one purpose of the Minnesota Nominee Vacancy Statute is to preserve the voters' choice of eligible candidates for an election).  The Minnesota Secretary of State argues that because LMNP voters cannot vote for the candidate of their choice, LMNP voters might suffer irreparable harm.  But any irreparable harm LMNP voters might suffer is the result of the unexpected death of their candidate, not the result of a state law that likely is preempted by federal law.  Harm caused by the death of a major political party nominee is materially different from harm caused by state action.  The Court cannot enjoin harm caused by Weeks's death, but the Court can enjoin harm caused by likely unenforceable state action.

### III.   The *Purcell* Doctrine

Minnesota's Secretary of State argues that this Court should abstain under the *Purcell* doctrine. *See generally Purcell*, 549 U.S. at 4. In *Purcell*, the plaintiffs challenged the State of Arizona's voter-identification law and sought a preliminary injunction enjoining its enforcement. *Id.* at 2–3. The United States District Court for the District of Arizona denied plaintiffs' motion for a preliminary injunction, and the United States Court of Appeals for the Ninth Circuit issued an interlocutory injunction pending appeal. *Id.* Holding that it is "necessary, as a procedural matter, for the Court of Appeals to give deference to the discretion of the District Court," the Supreme Court of the United States concluded that the Ninth Circuit's failure to do so constituted legal error. *Id.* at 5. But the Supreme Court underscored that it expressed "no opinion . . . on the correct disposition, after full briefing and argument, of the appeals from the District Court's . . . order or on the ultimate resolution of these cases." *Id. Purcell* establishes that it is improper for a court of appeals to fail to give deference to a district court's discretionary ruling on a motion for preliminary injunction affecting the election process. But, as this Court is considering the merits of a preliminary injunction in the first instance, *Purcell* does not require this Court to abstain from granting Plaintiffs' motion for a preliminary injunction.

To be sure, *Purcell* permits a federal court to abstain from issuing an order that could affect an impending election when that action could "result in voter confusion and consequent incentive to remain away from the polls." *Id.* at 4–5. And the Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140

S. Ct. 1205, 1207 (2020) (involving district court order, issued five days before the scheduled election, that "fundamentally alter[ed] the nature of the election"). Here, the preliminary injunction Plaintiffs seek does not fundamentally alter the nature or rules of the election, create voter confusion, or create an incentive for voters to remain away from the polls. As consistent with long-established federal law, a preliminary injunction *restores* and *maintains* the status quo that existed until the Minnesota Secretary of State's September 24, 2020 announcement following the death of the LMNP candidate.[8] As such, abstention is not warranted in this case.

## ORDER

Based on the foregoing analysis and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Movant Tyler Kistner's motion to intervene as a party defendant, (Dkt. 24), is **GRANTED**.

2.    Plaintiffs' motion for a preliminary injunction, (Dkt. 14), is **GRANTED**.

3.    Defendant Steve Simon, in his official capacity as Minnesota Secretary of State, is **ENJOINED** as follows:

    a. Because Plaintiffs are likely to succeed on the merits of their claim that

       Minnesota Statutes Section 204B.13 is preempted by federal law,

---

[8]    Notably, absentee voting had begun prior to the death of the LMNP's candidate on September 21, 2020, and the Minnesota Secretary of State has acknowledged that the ballots will not be changed prior to the November 3, 2020 general election. The Minnesota Secretary of State's September 24, 2020 announcement also observed that "eligible voters in the Second Congressional district should continue to vote." This Order is consistent with that statement.

Minnesota Statutes Section 204B.13 shall not be enforced as to Minnesota's Second Congressional District race in the November 3, 2020 general election;

b.  The Minnesota Secretary of State shall not refuse to give legal effect to the ballots cast in the November 3, 2020 general election for Minnesota's Second Congressional District; and

c.  The Minnesota Secretary of State shall not impede the right of Minnesota's voters to vote in the November 3, 2020 general election for Minnesota's Second Congressional District by communicating to voters that their ballots will not be counted.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  October 9, 2020                                  s/Wilhelmina M. Wright
                                                        Wilhelmina M. Wright
                                                        United States District Judge