UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| **ANGELA CRAIG**, and **JENNY WINSLOW DAVIES**,<br><br>Plaintiffs<br><br>v.<br><br>**STEVE SIMON**, in his official capacity as Minnesota Secretary of State,<br><br>Defendant,<br><br>and<br><br>**TYLER KISTNER**,<br><br>Intervenor-Defendant. | Case No.: 0:20-cv-02066 WMW/TNL<br><br><br><br>**MEMORANDUM IN SUPPORT OF MOTION FOR STAY PENDING APPEAL** |

The Court should stay its order of October 9, 2020, ECF No. 49 (the "Order"), which commands the Secretary of State to conduct an election for Minnesota's Second Congressional District on November 3, 2020, even though Minnesota law mandates that the election occur in February 2021 and even though the general public has understood for nearly three weeks that February is when the election would in fact occur. The Order is certain to disenfranchise thousands of voters who *already cast votes* on the understanding—grounded in law and the Secretary's reasonable representations—that no election for Minnesota's Second Congressional District would occur on November 3.

Federal law embraces the State's choice to conduct a February 2021 special election. Congress empowered Minnesota's legislature to determine under what circumstances a vacancy in a congressional office "is caused by a failure to elect."

1

2 U.S.C. § 8(a). Just as a state may determine that this failure occurs when one candidate does not achieve a majority vote, *Pub. Citizen, Inc. v. Miller*, 813 F. Supp. 821, 830 (N.D. Ga.), *aff'd*, 992 F.2d 1548 (11th Cir. 1993), or a natural disaster disrupts Election Day plans, Minnesota may lawfully determine that this type of failure occurs where a major-party candidate tragically dies on the eve of an election and an election would disenfranchise that party's supporters and render the election insufficiently indicative of popular will. Mr. Kistner is likely to prevail on appeal for this reason, among others.

The equitable balancing also favors a stay. On one side of the scale are the thousands of votes already cast on the reasonable understanding that the Second Congressional District election would not occur. Mr. Kistner's campaign has learned that **voters have in fact chosen not to vote in the contest based on the Secretary's representation**. To deprive these voters of a special election in February 2021, as reasonably promised, would disenfranchise them and, worse, result in the conduct of the election on an uneven playing field, as some voters understood they were voting in a congressional election and others understood they were not—a distinction based solely on the accident of what date each voter cast a vote. To conduct the election in this way would work a violation of the Equal Protection Clause, not its vindication. On the other side of the scale is Rep. Craig's asserted right to run for office on November 3. This is not a severe injury, as Rep. Craig can run on February 9, 2021, using the same funds she has already raised and presumably has been managing already under the contingent possibility of a February election (as Mr. Kistner's campaign has done). And any asserted

2

right to run with minimized competition is no right at all: Minnesota has a legitimate, indeed compelling, interest in conducting competitive elections.

For these reasons, and those set forth below, the Court should stay its order pending appeal.

## THE LEGAL STANDARD

"The party seeking a stay pending appeal must show (1) that it is likely to succeed on the merits; (2) that it will suffer irreparable injury unless the stay is granted; (3) that no substantial harm will come to other interested parties; and (4) that the stay will do no harm to the public interest." *James River Flood Control Ass'n v. Watt*, 680 F.2d 543, 544 (8th Cir. 1982); *Arkansas Peace Ctr. v. Arkansas Dep't of Pollution Control*, 992 F.2d 145, 147 (8th Cir. 1993); *see also Nken v. Holder*, 556 U.S. 418, 428 (2009). "The most important factor is the appellant's likelihood of success on the merits." *Brady v. Nat'l Football League*, 640 F.3d 785, 789 (8th Cir. 2011).

## ARGUMENT

### I.   Mr. Kistner Is Likely To Succeed on Appeal

The pending appeal is likely to succeed. Minnesota's Vacancy Provision, Minn. Stat. § 204B.13, cannot conflict with federal law when federal law affirmatively allows the State to conduct special elections "the time" of the State's choosing. 2 U.S.C. § 8(a). The Court's construction of this provision is unnaturally restrictive and narrower than the reading other courts have afforded.

3

### A.     The Elements of 2 U.S.C. § 8(a) Are Satisfied

Congress empowered states to prescribe in their "law" "the time for holding elections…to fill a vacancy" in some circumstances, including where "such vacancy is caused by a failure to elect at the time prescribed by law." 2 U.S.C. § 8(a). These elements are met here. Minnesota law reasonably deems an election compromised by the untimely death of a major-party candidate to be a failure to elect. Minn. Stat. § 204B.13, subd. 1(1). This will result in the "vacancy" of the Second Congressional seat as of January 3, 2021. Because of this causal connection between the failure to elect the vacancy, the statute, 2 U.S.C. § 8(a), empowers Minnesota law to define the time of a special election for that seat. Federal law does not preempt the Vacancy Provision, which does precisely that.

### 1.     There Is a Cognizable "Vacancy"

The Court concluded that there is no "vacancy" as required under 2 U.S.C. § 8(a) "because Minnesota's Second Congressional District currently is represented in the United States House of Representatives by Representative Craig." Order at 12. But the case law treats a *future* vacancy caused by a failure to elect as sufficient to trigger this element. A three-judge court in *Busbee v. Smith*, 549 F. Supp. 494 (D.D.C. 1982), rejected the argument "that section 8 is inapplicable because no vacancy will arise until the terms of the current representatives expire on January 3, 1983." *Id.* at 525. It found that 2 U.S.C. § 8(a) "clearly indicates that a failure to elect gives rise to a vacancy and in no way suggests that a state cannot choose representatives until January after failing to elect them in November." *Id.* Here, Plaintiffs admit that the Second Congressional

4

District will become vacant by operation of Minnesota law as of January 3, 2021, ECF No. 16 at 3, *see also* Order at 17, so the seat is vacant for purposes of 2 U.S.C. § 8(a).

The *Busbee* decision is binding precedent on this point because the decision was summarily affirmed by the United States Supreme Court. *Busbee v. Smith*, 459 U.S. 1166 (1983). Summary affirmances are binding on points that were "essential to sustain that judgment." *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 183 (1979); *Comptroller of Treasury of Maryland v. Wynne*, 135 S. Ct. 1787, 1800 (2015). In *Busbee*, the court's holding on the timing of the relevant "vacancy" was essential to the judgment, because an alternative resolution of that issue along the lines Plaintiffs propose (and the Court has provisionally adopted) would have rendered 2 U.S.C. § 8(a) inapplicable and changed the outcome of the case. *See Busbee*, 549 F. Supp. at 525. In any event, the Court's splitting with *Busbee* on this point, even if it were not binding, at least underscores that Mr. Kistner's appeal "raise[s] serious and substantial legal issues" meriting a stay pending appeal. *Arkansas Peace Ctr.*, 992 F.2d at 147.[1]

### 2. There Is a Cognizable Failure To Elect

The Court also found that Minnesota law cannot itself be the cause of a "failure to elect at the time prescribed by law." 2 U.S.C. § 8(a). Order at 14. But other courts have taken a different view. In *Public Citizen, Inc. v. Miller*, 813 F. Supp. 821 (N.D. Ga.), *aff'd*, 992 F.2d 1548 (11th Cir. 1993), the Court determined that Georgia law could

---

[1] The Court's treatment of *Busbee*, Order at 12–13, does not grapple with its holding about the timing of a cognizable vacancy and skips to an analysis of the meaning of a "failure to elect." This misses the point that, under *Busbee*, a future vacancy due to a failure to elect is cognizable under the statute.

5

legitimately find a "failure to elect" where no candidate crossed the 50% mark in the total vote, even though the state could have handed the race to the plurality vote-winner (as other states do). *Id.* at 830. The court found it sufficient that "the *statute* deems an election resulting in a mere plurality not to be a completed election." *Id.* (emphasis added). The court explained that the failure to reach a 50% mark "is similar to an election postponed due to natural disaster or voided due to fraud" and that "[t]his is not changed by the fact that a plurality outcome results in a failure to elect only because the state so declares." *Id.* The same is true here: the Minnesota *statute* deems an election missing a major-party candidate through unforeseen circumstances not to be a completed election. The Court's ruling is in intractable conflict with *Public Citizen*.

This difference, too, evidences that Mr. Kistner's appeal "raise[s] serious and substantial legal issues." *Arkansas Peace Ctr.*, 992 F.2d at 147. And the *Public Citizen* case has the better reading of the statute's plain text. A "failure to elect," 2 U.S.C. § 8(a), is itself a legal construct and necessarily looks to state law to determine when an election does and does not produce a legitimate outcome. It necessarily follows that a state statute can define a failure to elect for purposes of 2 U.S.C. § 8(a).

Further, Minnesota's determination of when an election cannot be conclusive—here, based on the death of a major-party candidate—is triggered by an event that plainly *is* beyond the State's control. A major-party candidate's death is like a natural disaster or voting fraud in the relevant sense "that each is contemplated, yet beyond the state's ability to produce." *Pub. Citizen*, 813 F. Supp. at 830. This is not a "carefully crafted law that, by its sole design, invents a 'failure to elect'" in order to evade the November

6

default election date. *Id.* Far from it, the statute reflects Minnesota's tragic experience with the untimely death of Paul Wellstone, and the Minnesota Legislature reasonably viewed an election compromised by such an event as insufficiently reflective of popular will to bind the State to its results.

That choice is as legitimate as Georgia's choice in *Public Citizen* to determine that a fractured vote with no clear majority winner is not sufficiently conclusive to bind the state to the outcome. *Id.* Further, Minnesota reasonably ties the failure to elect to the absence of a *major-party* candidate—i.e., one belonging to a party that is demonstrated to have widespread popular support. This case is no different from one where both the Democratic and Republican candidate tragically pass away on the eve of the election and a third-party or write-in candidate cruises to victory by sheer happenstance. In that case, as much as this one, the Court's ruling would treat Minnesota as powerless to declare a "failure to elect" even though no one would seriously view the result as reflective of popular will.

The Court also distinguished *Public Citizen* on the ground that "the State of Georgia actually held a general election on the congressionally mandated date in November," Order at 13–14, but *Public Citizen* itself held that an election could as easily be "*postponed*" for many reasons, such as a "natural disaster." 813 F. Supp. at 830 (emphasis added). The fact that the election was not postponed in *Public Citizen* is therefore not a material difference from this case, where it has been postponed.

### B.   Plaintiffs' Equal Protection Claim Is Meritless

The Court's order does not address Plaintiffs' equal-protection argument, Order at 15, and that argument lacks merit. Mr. Kistner is likely to succeed on any further litigation of this issue on appeal. Plaintiffs' claim under 2 U.S.C. § 7 is not an equal-protection claim, and a violation of a statute (if there were such a violation) is not a violation of the Equal Protection Clause. *See, e.g.*, *Marler v. Mo. State Bd. of Optometry*, 102 F.3d 1453, 1457 (8th Cir. 1996); *Weir v. Nix*, 114 F.3d 817, 821 n.7 (8th Cir. 1997).

Plaintiffs' contention that a February special election causes chaos and burdens the right to vote is exactly backwards: it is the unforeseen death of a major-party candidate that cause an election disruption. Minn. Stat. § 204B.13 was tailored by the Minnesota Legislature to *cure* that disruption and ensure fairness in the face of it. The requirement that voters go to the polls (or mail in ballots) again in February is a very minor price to pay for the overall integrity of the election, for the opportunity of major-party supporters to run and vote for their preferred candidate, and for the election to properly reflect the will of the voters, rather than the product of happenstance. This is a "reasonable, nondiscriminatory" imposition (if it can even be called that) on the right to vote, and Minnesota's interest in conducting a fair election with participation by all parties identified as "major parties"—and thus as enjoying widespread support among the general public. *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 190 (2008); *see New Georgia Project v. Raffensperger*, 2020 WL 5877588, --F.3d-- at *1 (11th Cir. Oct. 2, 2020).

Indeed, as explained below (§ II), it is the Court's order that imposes a severe, unjustified, and unacceptable burden on the right to vote. The order forces members of the public to vote on uneven terms, since votes have been cast for weeks on the reasonable understanding that no election would occur in the Second Congressional District, and the supporters of Mr. Weeks have not had the opportunity to find a replacement candidate to compete on the ballot. And it is the commencement of an election weeks after it was cancelled that is sure to throw the election into chaos, not the State's orderly approach of conducting a fair, competitive election in February.

In short, Minnesota's interests handily qualify as "important regulatory interests" that justify non-discriminatory burdens on the right to vote, *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997), and, in fact, qualify as *compelling* interests that avoid, rather than work, an equal-protection violation. *Cf. Monaghen v. Simon*, 888 N.W.2d 324, 331 (Minn. 2016). Any other view would render Minnesota Statute § 204B.13 unconstitutional even as applied to state and local races not affected by 2 U.S.C. § 7, a result *Plaintiffs disclaim*. Mr. Kistner is likely to succeed on this issue on appeal as well.

## II.   The Equitable Factors Weigh in Favor of a Stay

The equities of this case weigh overwhelmingly in favor of a stay. Voting has gone on for nearly three weeks since Mr. Weeks tragically passed away, and voters have declined to vote in that race in reasonable reliance on the Secretary's reasonable assertion under Minnesota law. Plaintiffs waited eight days to move for injunctive relief and never sought a temporary restraining order to stop the damage that was occurring day by day,

minute by minute. The only way to conduct the election consistent with the Equal Protection Clause is to conduct it in February, as the Secretary rightly planned to do. A stay is warranted.

### A. Mr. Kistner Would Suffer Irreparable Harm Without a Stay

Mr. Kistner and his supporters, and hundreds of thousands of other voters, will suffer irreparable harm in the absence of a stay. Elections cannot be stopped and restarted on a dime, especially *after voting begins*. Mr. Kistner respectfully disagrees with the Court's assessment that the order "*restores* and *maintains* the *status quo*." Order at 23. The *status quo* is that the November 3 election is off the schedule, and voters and Mr. Kistner's campaign took action in reasonable reliance on the *status quo*—which remained the *status quo* for a full eight days before Plaintiffs sought injunctive relief.

Beginning on September 24, voters in the Second Congressional District were informed that the election was compromised, that votes would not be counted, and that the election would occur in February 2021, not on November 3. This disincentivized the voters who cast ballots after September 24 from making any choice in the Second Congressional District race, and voters did in fact abstain from voting in that race. Declaration of William Grant ("Grant Decl.") ¶ 15. Now, the Court has ordered the contest to proceed and the Secretary to inform voters that votes in the race will be counted. This means that a second group of voters will vote with the understanding that the Second Congressional District race is on the ballot and will occur, and they will be incentivized to cast votes in that race.

This differential treatment is not only a harm, but a *constitutional* harm. The Equal Protection Clause forbids "arbitrary and disparate treatment of the members of [the] electorate." *Bush v. Gore*, 531 U.S. 98, 105 (2000). Election rules must therefore "satisfy the minimum requirement for nonarbitrary treatment of voters necessary to secure the fundamental right" to vote. *Id.* In short, "uneven treatment" of voters violates the Equal Protection Clause. *Id.* at 531. The Court's order necessarily results in uneven treatment of voters on the arbitrary basis of when they cast their votes. *See Moore v. Circosta*, No. 5:20-CV-507-D, 2020 WL 5880129, at *7 (E.D.N.C. Oct. 3, 2020) (granting a temporary restraining order to prevent a state from subjecting different voters casting votes at different times during absentee voting to different rules). And any possibility that persons who already voted may correct their ballots or otherwise cast a vote itself places an uneven burden on the right to vote, based on the arbitrary basis of when voters voted, and creates more problems than it solves in terms of integrity of the election.

"[E]ach qualified voter must be given an equal opportunity to participate in [the] election," *Hadley v. Junior Coll. Dist. of Metro. Kan. City*, 397 U.S. 50, 56 (1970), but the Court's order denies them that equal treatment and results in disenfranchisement on an uneven basis—a paradigmatic irreparable harm. *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 2016 WL 6584915, at *17 (D.N.J. Nov. 5, 2016) (collecting cases). The burdens are especially obvious as to the supporters of Mr. Weeks, who now have no candidate representing their major party on the ballot. But the burdens extend to *all* voters in the election who cast votes under the reasonable understanding that no election was occurring in the Second Congressional District.

These harms accrue directly to Mr. Kistner, whose supporters' rights are now compromised and severely burdened. *See Burdick v. Takushi*, 504 U.S. 428, 438 (1992) ("the rights of voters and the rights of candidates do not lend themselves to neat separation"); *Bullock v. Carter*, 405 U.S. 134, 143 (1972) (same). The Court has already held that Mr. Kistner has identified harms that are "concrete, particularized, and imminent, because [the requested relief] personally impacts Kistner's interests with respect to the impending election." Order at 5. Those interests will be irreparable harmed without a stay.

Mr. Kistner's campaign has suffered irreparable harms because the campaign took many actions in reasonable reliance on the Secretary's announcement that the contest would occur in February, not November, in accordance with Minnesota law. Grant Decl. ¶ 8. The Kistner campaign rescheduled events, including meet-and-greet events and forums. *Id.* ¶ 9. The campaign rescheduled fundraising events and meetings. *Id.* ¶ 10. Other campaigns and supporters of Mr. Kistner stopped disseminating Kistner campaign materials. *Id.* ¶ 11. The campaign cancelled advertising and declined to purchase advertising time that it would have otherwise purchased. *Id.* ¶ 12. Donors otherwise inclined to give to the campaign chose to fund other causes and candidates, and donations plummeted after it was announced that the election would not occur in November *Id.* ¶ 13. Independent expenditures related to the contest also appear to have ceased. *Id.* ¶ 14. As noted, voters have indicated that they did not cast votes in the Second Congressional District contest. *Id.* ¶ 15. Meanwhile, the campaign has made plans for an election in February. *Id.* ¶ 16.

12

All of these choices were eminently reasonable; it would have made no sense for the Kistner campaign to run a full-court-press campaign in September and October 2020 for a contest that would occur in February 2021. *Id.* ¶ 17. All of these harms are uniquely *irreparable* because the Court cannot turn back the clock to September 24 and start the election again. The *status quo* is a February 2021 election, not a November 2020 election. Votes have been cast, money has been spent, choices have been made, and the wheels on the election were spinning at full speed *before* the Court issued an injunction—indeed *before Plaintiffs sought it*.

"Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006). That risk is now a *certainty*, since tens of thousands of votes have been cast. It is for precisely these reasons that the Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election" and stayed lower-court orders on this basis. *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020); *see also Clarno v. People Not Politicians Oregon*, No. 20A21 (U.S. Aug. 11, 2020) (staying an injunction that had altered a state's signature and deadline requirements for placing initiatives on the ballot during the pandemic); *Merrill v. People First of Alabama*, No. 19A1063 (U.S. July 2, 2020) (staying an injunction that had suspended some state anti-fraud rules for absentee voting during the pandemic); *Barnes v. Ahlman*, 140 S. Ct. 2620 (2020) (staying an order that overrode a prison warden's decision about how to cope with the pandemic); *Little v. Reclaim Idaho*,

13

140 S. Ct. 2616 (2020) (staying an injunction that changed the rules for ballot initiatives during the pandemic). Federal courts of appeals have followed suit. *See, e.g.*, *New Georgia Project*, 2020 WL 5877588, at *4; *Democratic Nat'l Comm. v. Bostelmann*, No. 20-2835, 2020 WL 5951359, at *3 (7th Cir. Oct. 8, 2020). The Court's order inflicts harms beyond those deemed worthy of stays pending appeal in these cases: the Court has ordered an election to occur that has been—for *weeks*—cancelled.

The need for a stay is all the greater since Plaintiffs are, at least in part, the cause of the disenfranchisement. Mr. Weeks passed away on September 21, but Plaintiffs waited a full *eight days* to move for an injunction, and, even then, they did not ask for a temporary restraining order. The State and thousands of voters thus spent weeks taking action in reliance on the State's (lawful) determination and the Secretary's widely-publicized announcement that no November 3 election could occur for the Second Congressional District seat. Plaintiffs' delay in seeking an injunction, and the contribution of that delay to widespread and severe irreparable harm, is yet another reason one should never have issued, *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013), and an independent reason why the Court should issue a stay.

### B.     No Other Party Will Suffer Irreparable Harm

A stay will not inflict substantial harm on any other interested party. The harms alleged against Rep. Craig are not severe. Rep. Craig can run for election in February 2021, just as she can in November 2020, and can spend the same money she raised for the November election on the February election. The Court's finding that Ms. Craig "will be forced to conserve campaign resources in anticipation of a potential special election in

February," Order at 17, describes a comparatively insubstantial burden—since Rep. Craig has likely already taken many of those steps, as Mr. Kistner has. These burdens apply to all candidates evenly (including Mr. Kistner); can be overcome with appropriate budgeting and prudent campaign management; and, besides, appear to be *exacerbated* by the Court's order, since Rep. Craig (like everyone else) has had to assume since September 21 that no November election would occur and take appropriate measures to plan for a February election.

Further, the burdens on the right to vote equally apply to *Rep. Craig's* supporters, who (like everyone else) have been led to assume that no election would occur in November 3. So it is perplexing that Rep. Craig urges the Court to disenfranchise persons who might have voted for Rep. Craig had they believed the Second Congressional District race to be scheduled for November 3. Rep. Craig could as easily be assisted by an injunction as harmed. Meanwhile, if Rep. Craig's true (unstated) concern is that she would prefer to run without a candidate on the ballot from a major Minnesota political party, Legalize Marijuana Now Party, that is not a cognizable harm, but ordinary election competition.

The harm the Court identified to co-Plaintiff Davies is that "she is required to vote twice," Order at 17, but the opportunity to vote is not a severe burden on the right to vote. Any burden that exist is substantially outweighed by the burdens on voters who *already voted* under a different set of rules. Meanwhile, "the absence of uninterrupted congressional representation in the United States House of Representatives" is for a brief period only, a little more than a month. Any harm that short hiatus in representation bears

is outweighed by the voting rights of hundreds of thousand of residents in the Second Congressional District who will be forced to vote on unequal terms if the Court's order is not stayed.

### C. The Public Interest Favors a Stay

For the same reason, the public's interest falls decidedly in favor of a stay. On the one side of the balance are hundreds of thousands of votes that will be cast on fundamentally unfair terms, as some voters will know they are voting in the Second Congressional contest and many others believed they were not. These interests are of the highest order—outweighing even a state's interest in administration (which is itself harmed, not advanced, by the Court's injunction). *See, e.g.*, *Fish v. Kobach*, 840 F.3d 710, 755 (10th Cir. 2016) ("There is no contest between the mass denial of a fundamental constitutional right and the modest administrative burdens to be borne by Secretary [of State]'s office and other state and local offices involved in elections."); *United States v. Berks Cty.*, 250 F. Supp. 2d 525, 541 (E.D. Pa. 2003) (recognizing that "administrative expenses…are far outweighed by the fundamental right at issue."). The burden the Court's injunction imposes on these rights is severe to the utmost degree, and practically no interest could outweigh it.

"[I]t is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008).[2] Only a stay can vindicate those rights. Although the Court's opinion posits that the right to vote can be vindicated by holding

---

[2] Overruled on other grounds by *Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678 (8th Cir. 2012).

16

the November election, it is simply impossible to administer that election on an even playing field and in a fair way. *See Bush*, 531 U.S. at 110 (calling ballot counting to a close where it "will be unconstitutional" in application). Mr. Kistner also respectfully disagrees that upholding the *status quo* of a February 2021 election disenfranchises anyone: *all eligible voters will be free to vote in that election*. And all major parties will be represented, as Minnesota law contemplates.

On the other side of the scale are the slight burdens of campaign management issues Ms. Craig has had to navigate in any event, the need to vote in February, and a slight hiatus in representation. These minor burdens are handily justified by the voting rights of untold numbers of voters who deserve a *fair* election. Although Rep. Craig suggests that it would burden their rights to allow them to vote in February 2021, the opportunity to vote *advances* the right to vote; it does not *burden* that right. Nor can a November 3 election plausibly be identified as the better alternative, when there is simply no way to administer that election in a constitutional way.

## CONCLUSION

The Court should stay its order and injunction pending Mr. Kistner's appeal.

Dated: October 9, 2020					Respectfully submitted,

								/s/ R. Reid Le Beau II
								R. Reid LeBeau (#0347504)
								Jeffrey K. Holth (MN #0393070)
								Benjamin N. Pachito (MN #0398942)
								THE JACOBSON LAW GROUP
								Jacobson, Magnuson, Anderson & Halloran, P.C.
								180 E. Fifth St., Suite 940
								St. Paul, MN 55101
								Tel: (651) 644-4710
								Fax: (612) 339-0981
								rlebeau@thejacobsonlawgroup.com
								jholth@thejacobsonlawgroup.com
								bpachito@thejacobsonlawgroup.com